## S. J. STEWART (ELECTRIC) v. MANSURA COTTON OIL MILL, Inc.
### No. 4585.

Court of Appeal of Louisiana. Second Circuit.

June 5, 1933.

Atlee P. Steckler and J. Hugo Dore, both of Ville Platte, for appellant.

Couvillon & Couvillon, of Marksville, for appellee.

TALIAFERRO, Judge.

This case involves the right to have a so-called award of amicable compounders confirmed by the court.

Plaintiff repaired a 100 H. P. electric motor for defendant and rendered bill of $468 therefor. The motor did not give the satisfactory service, after being repaired, as was

expected of it, and defendant declined to pay the bill of plaintiff on the ground that the deficiency in the functioning of the motor was attributable to bad workmanship on part of plaintiff.

No suit was instituted to settle the dispute, but on September 5, 1932, the parties entered into a formal agreement to submit their differences to amicable compounders for arbitration. Plaintiff named Harry L. McLean as its arbitrator, and defendant selected Joseph E. Jubin to act for it; both residing in the city of New Orleans. The arbitrators accepted their appointment and subscribed to the proper oath. On September 19th, they appointed Carroll B. Norris, an instructor in the Electrical Engineering Department of Tulane University, as umpire. He agreed to serve as umpire and took the required oath.

The first session of the compounders was held, after notice to all parties, in New Orleans on October 3d. Defendant's officers could not attend this meeting, nor its witnesses. Plaintiff was present, and the testimony offered by him and his witnesses was heard and reduced to writing. The hearing was then adjourned until 10 o'clock a. m., October 8th, in order to give defendant opportunity to submit evidence, and on this date the compounders, with the umpire, again assembled at the designated place, plaintiff being present and defendant represented by one of its officers. Testimony offered by defendant was taken and the case closed for discussion and decision, with the understanding that the compounders and the umpire would meet at a certain place at the hour of 3 o'clock p. m., on October 11th, for this purpose. This meeting did not take place, and the amicable compounders at no time, after the case was closed, conferred or deliberated together in an effort to reach a decision in the case, or to reconcile differences between their opinions, if any existed. Mr. McLean rendered his written opinion of the matter, wherein he states that defendant is responsible to plaintiff for the repair bill in question. Mr. Jubin refused to render any verdict in the matter because there had not been any opportunity for discussion, deliberation, or conference between himself and McLean, as had been agreed, and because he did not think the manner in which McLean and Norris had brought the case to a close was regular or legal. Norris, the umpire, rendered his decision, in favor of plaintiff. He states in this decision:

" * * * The appraisers herein appointed being unable to reach a decision, and having called on me as umpire to settle their disagreements, and difficulties, namely, this: That the responsibility for the last burn out (the one in question) rests upon the Mansura Cotton Oil Co., and therefore render decision in favor of S. J. Stewart, Electric."

It is this decision and award of one of the compounders, concurred in by the umpire, that plaintiff seeks, by the rule herein sued out, to have confirmed and rendered executory.

Defendant has set up several defenses to plaintiff's demand, the following being the most important of them:

1. That the umpire was not appointed in the manner required by law, had no legal status as such, and his acts were null and void.

2. That the arbitrator McLean rendered his decision ex parte, without prior discussion or consultation with the other arbitrator, and therefore the two arbitrators had not been "unable to reach a decision," and not having failed to reach a decision in the case, the decision of the umpire was premature and without effect.

3. That the pretended award, sought to be confirmed, is null and void:

(a) Because it was not rendered by the arbitrators sitting as such and in accordance with law, but is the decision of one of them, H. L. McLean, given in advance of the closing of the arbitration proceedings and before knowing or ascertaining the position and decision of said other arbitrator.

(b) Because said McLean and the umpire Norris, without notice to the other arbitrator, pretended to make an award in favor of plaintiff, which was grossly "irregular and fraudulent and constitutes such behavior upon their part as to be highly prejudicial to the rights of petitioner" (defendant).

(c) Because, "that under the circumstances, the decision of the umpire, even if he had been legally appointed, which your respondent will forever deny, is wholly without right or virtue there not having been any disagreement or difference communicated to him, which existed between the arbitrators to settle, and to do so in advance, of such disagreement or difference, or conference and consultation by the arbitrators each with the other, in order to determine the question submitted to them, is grossly irregular, illegal and inequitable."

The lower court recalled the rule issued herein, disallowed plaintiff's demand, and refused any relief whatever. He appealed.

■ The duties and functions of amicable compounders are of a judicial nature and the trust reposed in them is of the highest importance. They are required, before entering upon the discharge of their duties, to subscribe to an oath "to render their award with integrity and impartiality" (C. C. art. 3111), and they "ought to determine as judges," being "authorized to abate something of the strictness of the law in favor of natural equity" (C. C. art. 3110). The law clothes them

with such power and authority over the matter confided to them for decision that they constitute a quasi court. The individual arbitrators, when they enter upon their duties, are supposed to be as unprejudiced and as impartial as a judge. If this were not so, the proceedings had before them and their official actions, instead of being impressed with the solemnity befitting judicial conduct, would, in fact, be a farce and a travesty on justice.

The law favors all efforts towards compromise of differences between citizens of the state. The organic law of the state has taken notice of the importance of providing means and methods for the arbitration of disputes.

Section 36 of article 3 of Constitution of 1921:

"It shall be the duty of the Legislature to pass such laws as may be proper and necessary to decide differences, with the consent of the parties, by arbitration."

And articles 3099-3132 of the Civil Code and articles 441-461 of the Code of Practice fully provide the detail of procedure necessary to be followed in order to create the board of arbitrators, and set the machinery of such in motion.

In the present case, the record leaves little or no doubt that the arbitration under discussion not only was not conducted in many respects as prescribed by law, but the atmosphere surrounding the whole procedure was surcharged with partiality and favoritism from the beginning. Both compounders conceived the idea that they, respectively, represented the side selecting them, and especially can this be said of Mr. McLean, appointed by plaintiff. Instead of patiently hearing the evidence offered by both litigants, and contenting themselves with directing the course of the proceedings, the arbitrators offered documentary evidence for or against their respective "sides." Article 3114 of the Civil Code provides that:

"The parties must attend the arbitrators either in person, or by their attorney, with their witnesses and documents."

Whatever may be said for or against the proceedings, to and including those had on October 8th, certainly it cannot be said that the purported award in favor of plaintiff was arrived at or adopted by following the letter or spirit of the law.

The testimony of Mr. Jubin, describing what happened, and how it happened, at Mr. McLean's office the evening of October 11th, is clear, convincing, and uncontradicted. We quote from it at length:

"Q. After the hearing of October 8th, you say that you did not decide the case. Did you and Mr. McLean—the other arbitrator—discuss it or confer on that day with the idea of arriving at a decision? A. We did not discuss it on that day. We set a date for the discussion between ourselves and the umpire.

"Q. What was that date that was set? A. The date was set by the umpire, Mr. C. B. Norris, for Tuesday, October 11th, at three o'clock, in Room H of the Roosevelt Hotel.

"Q. Was that agreed and understood at that time after the closing of the hearing on October 8th that it was to be taken up at the Roosevelt Hotel, Room H, on October 11th, at three o'clock, for the purpose of deciding the case or discussing it? A. Yes, sir.

"Q. Now state to the court just what happened, so far as your knowledge goes, with reference to the taking up of this case on October 11th. A. I will. On October 8th, when we finished the hearing of the S. J. Stewart Electric and Mansura Cotton Oil Mill, it was exactly twelve o'clock noon. Mr. Norris was in a hurry to get back to the University, saying that he had to attend a football game or something to that effect. Then Mr. McLean, Mr. Norris and myself discussed the time of meeting for Mr. McLean and myself to argue the merits of the case in the presence of the umpire, Mr. C. B. Norris. I told them that I was available at all times—it was up to them to set the time. So Mr. C. B. Norris, being a professor—please correct that—an instructor at Tulane University, said that on Monday it would be impossible for him to come to our meeting, but he could make it on Tuesday, October 11th, at three o'clock. He would be then free from his lessons at the university. So the date was set. We separated. On Monday, October 10th, I had some business to transact in the Maritime Building where Mr. McLean's office is located. I was on the same floor as Mr. McLean's office, so I had been very friendly with Mr. McLean, so I dropped in his office and told him, 'Hello, Mac! Everything set for tomorrow?' Mr. Stewart was present in McLean's office while I dropped in. Mr. McLean answered in this way: 'Everything is O. K. I will give you a buzz (meaning a ring on the phone).' I told him 'O. K. Mac,' and I left. The next day—October 11th—at about two o'clock, I called up Mr. McLean. I was in my office waiting for him to ring me. And asked him how was everything getting along, and had he been able to get in touch with the umpire, Mr. C. B. Norris, and he informed me that he had spoken to him early in the morning over the telephone, and then asked me did I get in touch with him. My answer was this: I say —'Mac, you know I never talked to Norris. You had charge to make all the arrangements. Therefore, I didn't call up Norris. No reason to call him.' It was then two o'clock. At quarter to three, I called his office again. Mr. McLean was absent. His office boy answered the telephone and he say he didn't know where Mr. McLean was. I

called up again at quarter after three. Mr. McLean was still absent from his office. I called at quarter to four. Mr. McLean then answered the phone and told me to come right over. Everything was set. I had one of my men to drive me to the Maritime Building, located on Carondelet and Common. I reached there in about five or six minutes. As I was about to enter the building, I met Mr. C. B. Norris coming out. He didn't see me, therefore I called him, saying 'Hello, Professor, where are you going?' The Professor was very nervous. I asked him 'What's the matter?' He didn't answer one way or the other. I said 'Have you seen Mr. McLean?' He said 'Yes, sir, I just came from up there.' I asked him—* * * I asked him 'How long have you been there, Professor?' He answered me 'A little after two o'clock.' Well then I asked him 'Why didn't you call me up?' Didn't you know that I was supposed to be at the meeting at three o'clock?

"Q. What time was that did you have this discussion? A. At quarter to four at the entrance of the Maritime Building. He said 'McLean has charge of that.' Then he said 'I am sorry I have to leave you now. I left my decision up there.' I asked him 'How could you leave your decision, Professor, when we haven't argued the case, and how do you know that this papers are correct' (referring to the papers I was talking about the first testimony). He say, 'Well, It's all over now—I have to go back home.' And he said 'I am sorry that I couldn't agree with you.' We then parted.

"Q. Did you then go up to Mr. McLean's office? A. I then proceeded to Mr. McLean's office. I greeted him when I entered his office. He asked me if I was ready to render my decision. I asked him 'Well where is the Professor?' McLean answered 'Oh, he just left. He came in and left.' I said 'Well, Mac, wasn't he supposed to be present at our discussion?' He gave me an evasive answer and said 'Not necessarily.' I asked him what he was doing in his office. He didn't answer that. I asked him how long he had been in his office. He said 'Just about five minutes.' Of course, I knew that McLean wasn't telling me the truth, because I met the Professor downstairs who told me he had been with Mac from approximately quarter after two. Therefore I was very cautious in the questions I was asking Mr. McLean. Mr. McLean then urged me to write my decision, saying that 'There is my decision written on the type-writer, unsigned. I am waiting for you, Jubin.' I told him 'Mac, you have something up your sleeve. Come out with it.' I asked him where he had been from two o'clock to quarter to four. He answered me he went to the picture show. Well then I asked him 'Why didn't you invite me to the picture show? I enjoy a show myself—especially on a day like this. We were supposed to meet and argue the case of S. J. Stewart Electric and Mansura Cotton Oil Mill.' I then got very—not very, but peeved at the way he was handling the thing.

"Q. Mr. Jubin, did Mr. McLean show you a decision already rendered and signed by Mr. Norris? A. Not yet. He was trying to make me write my decision before telling me that Norris had written his decision, but knowing, of course, Mr. McLean did not know that I met Mr. Norris downstairs five minutes before, therefore he was endeavoring to make me write my decision underneath his decision and then pull out the—decision of Mr. Norris. Finally I couldn't make him talk. I said 'I have this on you. I met the Professor downstairs.' Naturally Mr. McLean's expression changed. He said, 'Well, yes, I have it here.'

"Q. Have what? A. The decision. I told him that 'I met the Professor downstairs, who told me that he left his decision in your office.'

"Q. Was that the time that Mr. McLean showed— A. Then he pulled Mr. Norris' decision out from his desk drawer and showed it to me. I read it.

"Q. At that time, Mr. Jubin, was Mr. Norris in the office of Mr. McLean? A. He was not.

"Q. You read Mr. Norris' decision? A. I read Mr. Norris' decision.

"Q. Will you look at that (handing document to Mr. Jubin) and say if that's the decision by Norris? (Counsel hands the papers signed by C. B. Norris and attached to plaintiff's petition). A. That's it. I read it and showed this paragraph to Mr. McLean, saying ' * * * The appraisers herein appointed, being unable to reach a decision, and having called on me as umpire to settle their disagreements and difficulties,' I said 'How could Mr. Norris render such a decision when we haven't had any discussion?'

"Q. Had you—as one of the arbitrators—called on him as umpire to settle your disagreements and difficulties between yourself and Mr. McLean? A. No.

"Q. Had you had any disagreement or difficulty with regard to your decision in the controversy? A. No.

"Q. Had you had any discussion or consultation or conference with Mr. McLean—the other arbitrator—after the hearing and prior to your visit to Mr. McLean's office, which you have just described? A. No.

"Q. Had you and Mr. McLean come to any decision or disagreement whatever with reference to that controversy? . A. No. I told him, while I was in McLean's office, after I read and objected to this decision by the umpire, I told him: 'How could the umpire ren-

der such a decision when we haven't argued the case?' He says 'The law says this and the law says that.' I said, 'I don't know anything about the law.' He seemed to know something about it. I told him I didn't think it was right. I said—I further told Mr. McLean—I said 'Mac, you did wrong. You tried to pull something here that's not quite right. I don't like it. You may have, in arguing the case, made me see Stewart's side of the story and I would have agreed; or on the other hand, I may have made you see the Mansura Cotton Oil side of the story and made you agree with me. Then we wouldn't have to call on the umpire.' Also I wish to say that throughout the hearing I was very friendly with all parties. The fact is that Mr. McLean made most of the questioning in the case. Very few questions that I asked. I wish to say at this time that I only had the first copy of the hearing—the one set October 3rd—anyway the first hearing.

"Q. You didn't have a copy of the second session? A. No. There was two sets of copies.

"Q. You didn't have the transcription of the hearing—the second hearing? A. Of October 8th? No. I received that at quarter to four on October 11th when I went in Mac's office. On the first set of copy of hearing, the answers and questions were irregular and some of my questions to Mr. Stewart were entirely left out.

"Q. Mr. Jubin, who had these minutes transcribed? A. Mr. McLean in his office.

"Q. In the minutes of the second hearing it seems to end abruptly by an answer of Mr. Hayne to a question propounded by Mr. McLean. No further mention of any proceedings made. Was there anything that took place at the time of this hearing with regard to the further session of the court? A. Yes, sir. The question of our meeting—the two compounders and umpire—in Room H at the Roosevelt Hotel on October 11th at three o'clock.

"Q. Was Mr. Hayne present when this hearing of the arbitrators was had? A. He was there.

"Q. And Mr. Norris? A. He was there.

"Q. Did you sign any decision at all? A. I did not.

"Q. Did you and Mr. McLean then and there discuss the case with the view of — A. We didn't talk about the case. The only thing Mr. McLean was anxious to make me write and sign my decision. I didn't think it was proper and told him I would consult my lawyer.

"Q. Now at the time when you met Mr. Norris downstairs, or on the sidewalk just after he was leaving the place in which Mr. McLean had his office, what did he say with reference to signing the decision? A. He said he left his decision upstairs and was sorry he couldn't agree with me.

"Q. He informed you that he had already written his decision? A. He did.

"Q. You never had any discussion after this hearing with Mr. Norris in regard to the controversy? A. No sir, neither after nor before."

Mr. McLean was present in court when this testimony was given and did not take the stand to refute it.

■ There is no merit in defendant's attack on the umpire's status because of illegality in being selected. He may be appointed by the arbitrators at the time of the submission, or later. C. C. art. 3117. He only functions where there is disagreement between the arbitrators. C. C. art. 3116. The umpire in this case participated in the progress of the proceedings and to all intents and purposes functioned more like a third arbitrator than as an umpire. He certainly attempted by his decision to break a supposed disagreement between the compounders without knowing there was any such disagreement and without being jointly asked by the arbitrators to cast his vote on the matter before them, when, in truth and fact, so far as the record shows there was no disagreement, and there had been no discussion or consultation by the arbitrators to determine if they were of one mind, or irreconcilably disagreed, as to the decision to be rendered in the case.

■ It is indispensable to the validity of any award of amicable compounders that such award be reached after full consideration of the evidence adduced before them, and after opportunity has been given to each compounder to express his opinion of the case following a deliberate weighing of the evidence; and until this has been done it cannot be said that there is, or could be, any disagreement between the compounders, and if no disagreement, there can be no deciding vote by the umpire. And where it appears that in violation of an agreement by the compounders to meet at a certain time, after the taking of testimony by them has been concluded, for the purpose of discussing the case and weighing the evidence introduced, one of the arbitrators and the umpire in concert, during the absence of the other arbitrator, reach a decision in the case, which is opposed, not concurred in, by the absent arbitrator, such decision amounts to fraud against a litigant unfavorably affected thereby, and will be annulled by the court.

"If there are several arbitrators named by the submission, they can not give their award, unless they all see the proceedings and try the cause together; but it is not nec-

essary that the award be signed by them all."
C. C. art. 3126.

The case of Headley v. Commercial Standard Ins. Co., 17 La. App. 25, 134 So. 305, 307, discusses to considerable extent the principles involved in the instant case. There a policy of fire insurance, containing a provision for appointment of appraisers to determine the amount of loss, and selection by them of an umpire in event of disagreement between them, was considered. The umpire and one appraiser signed an award without any conference or consultation between the umpire and the other appraiser. The court appropriately comments:

"The record shows that testimony was introduced without objection by plaintiff showing that Gleny had, before signing the award, conferred with Oster, and not, at all, with Leblanc. Counsel says, that this evidence was admissible under the allegations of fraud and misrepresentation made by plaintiff, and cannot be considered for the determination of the question submitted under the plea of enlargement of the pleadings, because it would permit the creating of a new issue. * * *

"It is hard to conceive how he could pass with strict impartiality on the difference that might exist between the other appraisers in reference to the damage or loss involved, without having a conference or consultation with them on the subject.

"The duties of the umpire, it seems to us, as declared in his appointment and his oath, necessarily implied the requirement of a conference, and were sufficient, being annexed to the answer, to permit the introduction of evidence on that subject, though not specifically alleged in plaintiff's petition, and did not have the effect of creating a new issue."

In that case the award sought to be enforced, for the reasons stated, was held invalid.

On this question Cooley, in his Briefs on the Law of Insurance, vol. 4, p. 3644, says:

"But when the umpire has been appointed and there has been a disagreement, an award reached by the umpire and one of the appraisers, without conference with the other appraiser, is invalid. Such conduct results practically in depriving one of the parties of any representation in the appraisal proceedings, which become, therefore, of no effect as to him."

The case of Benjamin Co. v. Royal Mfg. Co., 172 La. 965, 136 So. 19, while not in point, contains a lucid discussion of the law applicable to the duties of amicable compounders.

We think the judgment of the lower court eminently correct, and it is affirmed.